958 P.2d 962 (1998)
135 Wash.2d 542
SKAGIT SURVEYORS AND ENGINEERS, LLC, a Washington limited liability corporation; Skagit County Association of Realtors, a Washington non-profit corporation; and Willard M. Hendrickson, and Ida M. Hendrickson, husband and wife, d/b/a Hendrickson Realty, Respondents,
v.
FRIENDS OF SKAGIT COUNTY, a Washington non-profit corporation, Petitioner,
Barbara Rudge and Andrea Xaver, individually; and The Western Washington Growth Management Hearings Board, Defendants,
State of Washington, Intervenor.
SKAGIT COUNTY, a municipal corporation, Respondent,
v.
FRIENDS OF SKAGIT COUNTY, a Washington non-profit corporation, Petitioner,
Barbara Rudge and Andrea Xaver, individually; and the Western Washington Growth Management Hearings Board, Defendants,
State of Washington, Intervenor.
No. 64798-4.
Supreme Court of Washington, En Banc.
Argued November 19, 1997.
Decided June 25, 1998.
*964 Bricklin & Gendler, David Bricklin, Seattle, for Petitioner.
Barbara Rudge, Anacortes, Andrea Xaver, David Needy, Skagit County Prosecutor, John Moffat, Deputy Skagit County Prosecutor, Paul Taylor, Mount Vernon, Peter Buck, Kitteridge Oldham, Buck & Gordon, Seattle, Groen & Stephens, John Groen, Bellevue, for Petitioners.
Christine Gregoire, Attorney General, Marjorie Smitch, Alan Copsey, Assistant Attorney Generals, Olympia, for Respondents.
Paul M. Parker, Olympia, Amicus Curiae on behalf of Washington State Association of Counties.
Law Offices of J. Richard Aramburu, Jeffrey M. Eustis, Seattle, for Amicus Curiae on behalf of 1000 Friend of Washington.
*963 GUY, Justice.
In this direct appeal from a growth management hearings board decision, we are asked to determine the scope and validity of the enforcement sections of Washington's Growth Management Act, RCW 36.70A, and the validity of their application in this case.
Petitioners claim that a growth management hearings board does not have authority to invalidate a zoning ordinance which was enacted before the effective date of the Growth Management Act. They also claim the Growth Management Act violates federal and state constitutional guarantees. We agree that the growth management hearings board did not have statutory authority, in this case, to invalidate the county's pre-Act regulations. Because we decide this appeal on statutory grounds, we do not reach the constitutional issues.

FACTS
To provide a basis for better understanding the factual background and procedural history of this case, a discussion of the development of the Growth Management Act precedes the statement of facts.
Statutory Framework
This state's Growth Management Act was enacted in 1990 in response to the problems associated with an increase in population in this state, particularly in the Puget Sound area, in the 1980s. Laws of 1990, 1st Ex. Sess., ch. 17. These problems included increased traffic congestion, school overcrowding, urban sprawl, and loss of rural lands. See Richard L. Settle & Charles G. Gavigan, The Growth Management Revolution in Washington: Past, Present, and Future, 16 U. PUGET SOUND L. REV. 867, 880 (1993); Jeffrey M. Eustis, Between Scylla and Charybdis: Growth Management Act Implementation that Avoids Takings and Substantive Due Process Limitations, 16 U. PUGET SOUND L. REV. 1181, 1185 (1993). The law has been amended every year since it was enacted.[1]
The reason for the enactment is expressed in RCW 36.70A.010, as follows:
The legislature finds that uncoordinated and unplanned growth, together with a lack of common goals expressing the public's interest in the conservation and the wise use of our lands, pose a threat to the environment, sustainable economic development, and the health, safety, and high quality of life enjoyed by residents of this state....
The Growth Management Act imposed substantial new requirements on local governments. Erickson & Assocs. v. McLerran, 123 Wash.2d 864, 876, 872 P.2d 1090 (1994). Among those requirements is the duty on the part of most counties, including Skagit County, to develop a comprehensive land use plan which, at a minimum, includes a plan, scheme, or design addressing each of the following elements: (1) land use, (2) housing, (3) capital facilities, (4) utilities, (5) rural areas, and (6) transportation. RCW 36.70A.040, .070. See also RCW 36.70A.080 (optional elements of comprehensive plans).
*965 The Legislature adopted 13 goals to guide the development and adoption of comprehensive plans. Two of those goals are involved in this case. They are:
(1) Urban growth. Encourage development in urban areas where adequate public facilities and services exist or can be provided in an efficient manner.
(2) Reduce sprawl. Reduce the inappropriate conversion of undeveloped land into sprawling, low-density development.
RCW 36.70A.020.
The primary method required for meeting these two goals is set forth in RCW 36.70A.110. That provision requires counties to "designate an urban growth area or areas within which urban growth shall be encouraged and outside of which growth can occur only if it is not urban in nature." RCW 36.70A.110(1).[2] It is this requirement of the Act that is at the core of the dispute in this appeal.
As enacted in 1990, the Growth Management Act required counties to designate "urban growth areas" (UGAs) concurrently with the adoption of their comprehensive plans on or before July 1, 1993. Laws of 1990, 1st Ex.Sess., ch. 17, §§ 4(3), 11. It became apparent that counties would not be able to meet this deadline and so, in 1993, the Legislature extended the time for counties to complete their comprehensive plans to July 1, 1994. Laws of 1993, 1st Sp. Sess., ch. 6, § 1(3). However, the 1993 amendments to the Act also required counties to designate "interim urban growth areas" (IUGAs) that would be effective on or before October 1, 1993, during a county's planning period. Laws of 1993, 1st Sp. Sess., ch. 6, § 2(4).
As originally enacted, the Growth Management Act had no administrative enforcement mechanism. In 1991 the Legislature created three growth management hearings boards, one for Eastern Washington, one for Western Washington, and one for the Central Puget Sound area. Laws of 1991, 1st Sp. Sess., ch. 32, § 5 (codified at RCW 36.70A.250).[3] The boards have authority to hear and determine petitions filed pursuant to RCW 36.70A.280 and .290, and to order compliance with the Act within a reasonable time. RCW 36.70A.300.
Enforcement provisions were added in 1991 and in 1995. Laws of 1991, 1st Sp. Sess., ch. 32, § 14(3) (codified at RCW 36.70A.330(3)); Laws of 1995, ch. 347, §§ 110, 112 (codified at former RCW 36.70A.300(2)-(3) and former RCW 36.70A.330(4)(b)). RCW 36.70A.330(3) authorizes a hearings board to recommend that the Governor impose economic sanctions against a local government that is not in compliance with the requirements of the Growth Management Act. This section is not at issue in this appeal. Former RCW 36.70A.300(2) authorizes a hearings board, in certain circumstances, to invalidate county plans or regulations that substantially interfere with the fulfillment of the goals of the Act.[4] It is this provision of the Act that is challenged by the petitioners in this case.
*966 Factual and Procedural History
Skagit County adopted its zoning ordinance in 1979. Skagit County Code (SCC) 14.04. It is not disputed that this ordinance does not comply with the requirements of the Growth Management Act.
After the passage of the Growth Management Act, Skagit County adopted the temporary or interim zoning regulations which are pertinent to this appeal. One, SCC Ordinance 14925, was intended to reduce urban sprawl by establishing a five-acre minimum lot size for all residential zoning outside of urban areas. In adopting this urban sprawl control ordinance, the Board of County Commissioners stated:
[D]uring the first six months of 1993 there have been a significant increase in the number of proposed land divisions at densities greater than 1 residence per 5 acres and if permitted to continue in the unincorporated portion of Skagit County, undesirable sprawling, low-density growth patterns quickly emerge. Left unchecked, this land development pattern creates an imminent danger to public or private property and poses a threat to the environment[.]
Ex. R-12B.
The County also adopted statutorily required ordinances establishing interim urban growth areas.
In early March 1995, Friends of Skagit County and two individual petitioners, Barbara Rudge and Andrea Xaver (hereafter referred to collectively as Friends or Friends of Skagit County), filed petitions with the Western Washington Growth Management Hearings Board (Board). In part, the petitions challenged the method of adoption and adequacy of the Skagit County ordinance which established interim urban growth areas. Friends claimed, in part, that the County was not in compliance with the Growth Management Act because the County allowed urban residential, commercial, and industrial development outside municipal boundaries without proper adoption of IUGAs. The County's ordinance enacted to control urban sprawl was not challenged.
The cities of Anacortes and Mt. Vernon intervened in the action.
Following a hearing, the Board determined that Skagit County was not in compliance with the Growth Management Act with respect to the adoption of its ordinances pertaining to interim urban growth areas. The Board ordered the County to:
1. Eliminate any urban growth area designations outside of the city or town limits of Anacortes, Mt. Vernon, Burlington, Hamilton, La Conner, Sedro Woolley, Lyman, and Concrete within 30 days of this Order. No other interim growth areas may be designated until the information and analysis required by the [Growth Management Act] is completed.
2. Clarify the language of the ordinances to preclude new urban residential, commercial, or industrial development outside a property [sic] designated IUGA within 60 days of the date of this order. Clarify the language of the ordinances to preclude extension of urban governmental services in accordance with CPP 1.8 outside a property [sic] designated IUGA within 60 days of the date of this order.
3. Base any new IUGA designation upon the OFM [Office of Financial Management] population forecast and the required land capacity, capital facilities and fiscal impact analyses. The new ordinance must identify open spaces and green belts.
Supp. Admin. R. 63-64 (Amended Order dated Oct. 31, 1995).
On December 26, 1995, apparently in reaction to the Board's order, Skagit County's Board of Commissioners passed an ordinance purporting to rescind the County's urban sprawl control ordinance.[5] No action was taken by the County to readopt the urban sprawl control ordinance or to otherwise limit urban growth to urban areas.
*967 Friends responded to the County's action by filing a motion with the Board asking for a finding of noncompliance and, further, asking the Board to declare Skagit County's 1979 zoning ordinance invalid. Friends argued to the Board that the County had not complied with the Board's order and that the rescission of the interim urban sprawl control ordinance resulted in a revival of the pre-existing zoning ordinance. Friends claimed the County had "opened the flood gates" for suburban sprawl in more than 60,000 acres in Skagit County.
The Board determined the County had complied with only one aspect of the October 31, 1995 order, that of placing the IUGA limits at the city limits of designated cities. The County apparently stated at the hearing that it would comply with the remainder of the order "in due time," and that it did not intend to take further action until its comprehensive plan was adopted. The Board found the County was not in compliance with the goals and requirements of the Act regarding the limiting of urban growth outside interim urban growth areas.
The Board also concluded that the County's attempted rescission of its interim urban sprawl control ordinance, together with its consistent track record for missing its own deadlines for adoption of ordinances, were compelling reasons to declare invalid those parts of the 1979 Skagit County zoning code which related to the requirements of the Board's October 1995 order, in order to preclude substantial interference with the fulfillment of the goals of the Growth Management Act. The Board entered Findings of Fact, Conclusions of Law and an Order which declares nine sections of the Skagit County code, and their implementing maps and amendments, invalid. The Board's order states, in part:
We find Skagit County to be in continued noncompliance with the goals and requirements of the Act regarding preclusion of new urban residential, urban commercial or urban industrial development and urban governmental services outside properly-designated IUGAs....
Although many sections of the zoning code do not comply with the Act, we declare invalid only those that most egregiously interfere with the County's future ability to fulfill the goals of the Act.
Supp. Admin. R. 297-98.
Skagit County timely filed a petition for review in superior court and properly served all parties, including the cities of Anacortes and Mt. Vernon. However, the body of its petition failed to name the City of Anacortes and the City of Mount Vernon as parties to the Board action. A copy of the Board's order, which lists the cities of Anacortes and Mt. Vernon as parties to the proceeding, was attached to and incorporated in the County's amended petition.
Skagit Surveyors and Engineers, Skagit County Association of Realtors, and Willard and Ida Hendrickson, doing business as Hendrickson Realty (hereafter referred to collectively as Surveyors) also attempted to challenge the Board's order. Surveyors are businesses and organizations located in and doing business in Skagit County. Surveyors timely filed their petition in the Skagit County Superior Court. Surveyors properly served some of the parties but failed to directly serve Skagit County, the City of Anacortes and the City of Mount Vernon. Instead, Surveyors served the attorneys for those governmental entities.[6]
Friends followed the statutory procedure for requesting direct appellate review, RCW 34.05.518, and the Court of Appeals accepted review and consolidated the petitions. Friends, citing Union Bay Preservation Coalition v. Cosmos Dev. & Admin. Corp., 127 Wash.2d 614, 902 P.2d 1247 (1995), then moved to dismiss the petitions for failure to properly invoke appellate jurisdiction over the administrative order. The Commissioner for the Court of Appeals denied the motion without prejudice so that the matter could be considered by the full court.
The parties moved for direct review by this court and this court accepted review.
*968 The State intervened in this appeal solely for the purpose of responding to Petitioners' challenges to the constitutionality of the Growth Management Act.
The Western Washington Growth Management Hearings Board has filed a brief responding to Petitioners' argument that the Board's order constituted a regulatory taking that should be compensated by the Board.
Two amici curiae briefs have been filed. One was submitted by the Washington State Association of Counties in support of Skagit County, arguing that the invalidation of Skagit County's pre-Growth Management Act land use ordinances is contrary to the goals and purposes of the Act. The other was filed by 1000 Friends of Washington (1000 Friends) in support of Friends of Skagit County, arguing that the Act's provision authorizing an order of invalidity is constitutional and is a necessary remedial measure for the integrity of the Act.

ISSUE
One issue is dispositive:
Did the Growth Management Hearings Board exceed its statutory authority or jurisdiction when it ruled that certain Skagit County zoning regulations, which were enacted prior to the Growth Management Act, are invalid because they substantially interfere with the fulfillment of the goals of the Act?

DISCUSSION
We turn first to Friends' motion to dismiss the petitions filed in this case.
Friends has moved to dismiss both petitions for review on jurisdictional grounds. First, Friends argues that Surveyors' petition must be dismissed under the holding of Union Bay because Surveyors served only the attorneys for some of the parties, and did not serve those parties personally. Second, Friends urges this court to expand the holding of Union Bay by deciding that the failure of both Surveyors and Skagit County to name, in their petitions, all of the parties to the proceeding before the Board results in a lack of appellateor subject matterjurisdiction in the superior court.
Appeals from decisions of growth management hearings boards are governed by the Administrative Procedure Act (APA), RCW 34.05. See RCW 36.70A.300(5)
An appeal from an administrative tribunal invokes the appellate, rather than the general, jurisdiction of the superior court. Union Bay, 127 Wash.2d at 617, 902 P.2d 1247. Acting in its appellate capacity, the superior court is of limited statutory jurisdiction, and all statutory procedural requirements must be met before jurisdiction is properly invoked. Fay v. Northwest Airlines, Inc., 115 Wash.2d 194, 197, 796 P.2d 412 (1990); Clymer v. Employment Sec. Dep't, 82 Wash.App. 25, 27, 917 P.2d 1091 (1996).
The procedural and jurisdictional requirements are set forth in former RCW 34.05.542(2),[7] which states:
A petition for judicial review of an order shall be filed with the court and served on the agency, the office of the attorney general, and all parties of record within thirty days after service of the final order.
In Union Bay, we held that a superior court did not obtain jurisdiction over an appeal from an agency decision unless the appealing party timely filed a petition for review in the superior court and timely served the petition on all of the parties. Union Bay, 127 Wash.2d at 617-18, 902 P.2d 1247 (citing City of Seattle v. Public Employment Relations Comm'n, 116 Wash.2d 923, 926, 809 P.2d 1377 (1991)).
The question before the court in Union Bay was whether service on a party's attorney of record satisfied the service requirements of the APA. Based on the statutory definition of "party" contained in the APA, and in light of the legislative history of RCW 34.05, this court held that attorneys of record were excluded from the phrase "parties *969 of record" as that term is used in RCW 34.05.542(2). Thus, in order to invoke the superior court's jurisdiction to review an administrative order at times pertinent here, an appellant was required to file a petition for review and serve the petition on the parties of record, not just on their attorneys.[8]Union Bay, 127 Wash.2d at 619-20, 902 P.2d 1247. Substantial compliance with the service requirements of the APA is not sufficient to invoke the appellate, or subject matter, jurisdiction of the superior court.[9]
Lack of jurisdiction over the subject matter renders the superior court powerless to pass on the merits of the controversy brought before it. Deaconess Hosp. v. Washington State Highway Comm'n, 66 Wash.2d 378, 409, 403 P.2d 54 (1965) (Donworth, J., concurring in part and dissenting in part). Surveyors argue that Friends' motion to dismiss should be denied because only Anacortes or Mt. Vernon has standing to raise the jurisdictional issue, and neither city protests the method of service. While litigants, like the cities involved here, may waive their right to assert a lack of personal jurisdiction, litigants may not waive subject matter jurisdiction. Deaconess Hosp., 66 Wash.2d at 410, 403 P.2d 54 (Donworth, J., concurring in part and dissenting in part); Skagit Motel v. Department of Labor & Indus., 107 Wash.2d 856, 858-59, 734 P.2d 478 (1987). Any party to an appeal, including one who was properly served, may raise the issue of lack of subject matter jurisdiction at any time. RAP 2.5(a)(1); In re Saltis, 94 Wash.2d 889, 893, 621 P.2d 716 (1980).
The issue raised in relation to the motion to dismiss the petition of Surveyors is identical to the issue raised in Union Bay. That is, does the superior court acquire jurisdiction to make rulings in an appeal under the APA if service is made on an attorney of record in lieu of service on a party. Union Bay strictly construed and applied the APA and dismissed the petition for review because Union Bay Preservation Coalition had served the attorneys rather than the parties in the case; thus Union Bay did not perfect jurisdiction in the superior court. Union Bay, 127 Wash.2d 614, 902 P.2d 1247.
Similarly, Surveyors did not properly invoke the jurisdiction of the superior court in this case. The motion to dismiss the petition of Surveyors is granted.
While we recognize this is a harsh result and that a different result would be reached in this case now, under the amended version of the statute, we are constrained by the language of the former statute, our interpretation of that statute, and the Legislature's failure to respond to Union Bay until after the events in this case occurred.
Friends next asks us to expand the scope of our Union Bay holding by interpreting other procedural provisions of the APA as jurisdictional requirements. Friends asks that the County's petition be dismissed because the County failed to name, in the body of its petition, all of the parties to the proceeding below, as required by RCW 34.05.546(5). Friends cites no support for this proposition. We decline to hold that strict compliance with RCW 34.05.546 is a jurisdictional requirement. The County attached and incorporated the Board's order to its petition. That order identified the cities as parties to the proceedings before the Board. The County's failure to name Anacortes and Mt. Vernon in the body of its petition is not a defect that deprives the court of subject matter jurisdiction. The motion to dismiss the petition of Skagit County is denied.
We turn now to the appeal of Skagit County.
Statutory Authority of Board
The County argues that the Growth Management Hearings Board had no authority to invalidate the County's pre-Growth Management Act regulations.
*970 Under the provisions of the APA, which governs this appeal, a reviewing court must grant relief from an agency's order if the court determines the order is outside the statutory authority or jurisdiction of the agency. RCW 34.05.570(3)(b).
Our analysis of the Growth Management Hearings Boards' authority to impose or fashion a remedy in any given case begins with the principle that administrative agencies are creatures of the Legislature, without inherent or common-law powers and, as such, may exercise only those powers conferred by statute, either expressly or by necessary implication. Kaiser Aluminum & Chem. Corp. v. Department of Labor & Indus., 121 Wash.2d 776, 780, 854 P.2d 611 (1993); Human Rights Comm'n v. Cheney Sch. Dist. 30, 97 Wash.2d 118, 125, 641 P.2d 163 (1982). The power of an administrative tribunal to fashion a remedy is strictly limited by statute. See, e.g., Human Rights Comm'n, 97 Wash.2d at 125, 641 P.2d 163. We therefore look to the Growth Management Act, itself, to determine the authority of the Board in this case.
The County claims the statute limits a board's authority in two ways. The first is by the Act's narrow definition of a growth management hearings board's jurisdiction. The second is by restrictions placed upon a board's use of the Act's invalidity and sanctions sections.
RCW 36.70A.280(1) provides:
A growth management hearings board shall hear and determine only those petitions alleging either:
(a) That a state agency, county, or city planning under this chapter is not in compliance with the requirements of this chapter... or
(b) That the twenty-year growth management planning population projections adopted by the office of financial management pursuant to RCW 43.62.035 should be adjusted.
(Emphasis added.)
The language of this statutory section authorizes a hearings board to determine whether actionsor failures to acton the part of a county comply with the requirements of the Growth Management Act. Conceivably, if a county refused to comply with the requirements of the Act, a growth management hearings board could look to pre-Act ordinances to determine whether the county was otherwise in compliance with the Act.
Where a county takes action to comply by enacting a plan or regulation, a petition to challenge the particular plan or regulation is governed by RCW 36.70A.290(2), which provides in pertinent part:
All petitions relating to whether or not an adopted comprehensive plan, development regulation, or permanent amendment thereto, is in compliance with the goals and requirements of this chapter ... must be filed within sixty days after publication by the legislative bodies of the county or city.
This section limits a board's authority to consider a challenge to a particular plan or development regulation to those plans and regulations that are enacted after the effective date of the Growth Management Act. A pre-Act ordinance could never be challenged under this section of the Act because the 60-day limitation period could not be met in such a case.
The initial petition filed by Friends in this case alleged that the County's IUGA ordinance, a post-Act ordinance, did not comply with the requirements of the Act. The Western Washington Growth Management Hearings Board had jurisdiction to consider the petition under either RCW 36.70A.280(1) or.290(2). The County does not dispute this jurisdiction.
After a hearing on a petition, a growth management hearings board must issue a final order pursuant to RCW 36.70A.300. This section provides that the final order must either (1) find compliance with the requirements of the Growth Management Act, or (2) find noncompliance and order the affected governmental entity to comply within a reasonable time.
A final order determining that a county plan or regulation does not comply with the Growth Management Act does not affect the validity of the challenged plan or regulation, unless the board determines enforcement *971 of the plan or regulation would substantially interfere with the fulfillment of the Act's goals. RCW 36.70A.300(4). The statute provides:
Unless the board makes a determination of invalidity as provided in RCW 36.70A.302, a finding of noncompliance and an order of remand shall not affect the validity of comprehensive plans and development regulations during the period of remand.
RCW 36.70A.302(1)[10] provides:
A board may determine that part or all of a comprehensive plan or development regulations are invalid if the board:
(a) Makes a finding of noncompliance and issues an order of remand under RCW 36.70A.300;
(b) Includes in the final order a determination, supported by findings of fact and conclusions of law, that the continued validity of part or parts of the plan or regulation would substantially interfere with the fulfillment of the goals of this chapter; and
(c) Specifies in the final order the particular part or parts of the plan or regulation that are determined to be invalid, and the reasons for their invalidity.
RCW 36.70A.302(4) specifically relates to the board's ability to declare invalid ordinances that were adopted before the passage of the Growth Management Act. That subsection provides:
If the ordinance that adopts a plan or development regulation under this chapter includes a savings clause intended to revive prior policies or regulations in the event the new plan or regulations are determined to be invalid, the board shall determine under subsection (1) of this section whether the prior policies or regulations are valid during the period of remand.
These provisions relating to invalidity were first added to the Growth Management Act in 1995, on the recommendation of the Governor's Task Force on Regulatory Reform.[11] The Task Force's Report to the Governor states that members of local governments had questioned whether a plan or regulation which is found to violate the requirements of the Growth Management Act remains in effect after the board issues its final order of noncompliance and during the period of remand. GOVERNOR'S TASK FORCE ON REGULATORY REFORM, FINAL REPORT 52 (1994). The Task Force, recognizing that a local plan or regulation which violates state law is technically invalid,[12] recommended that
a comprehensive plan or development regulation which is found to be invalid should remain in effect, unless the Growth Management Hearings Board determines that continued enforcement of the plan would violate the policy of the [Growth Management Act]. The Board should make appropriate findings and conclusions to support this determination and should limit the effect of its determination to those portions of the plan or regulation that violate the policy of the [Act].
Report at 52.
The Report further explains:
Under the [Growth Management Act], a local government's development regulations must be consistent with its comprehensive plan. If a comprehensive plan is declared invalid, or if a development regulation is found to be inconsistent with the plan, the validity of any permits issued by the local government under the authority of those development regulations will be called into question.
Because there are many different circumstances in which this issue may arise, it is not possible to develop a single principle which would apply in all cases. Therefore, the Task Force is recommending giving the Growth Management Hearings Boards discretion to make the determination on a case-by-case basis. The presumption *972 should be that the plan or regulation will remain in effect unless the Board determines this would violate the policy of the [Growth Management Act].
Report at 52.
In the present case, the Board issued a final order determining that the County was not in compliance with the requirements of the Act with respect to its interim urban growth areas regulations but did not invalidate the IUGA ordinances. The Board remanded the matter to Skagit County, ordering certain actions be taken within specified time periods. The County does not dispute that the Board had authority to enter this order.
Following the entry of a determination of noncompliance and an order of remand, a growth management hearings board must set a hearing to determine whether the county has met with the requirements of the Act, as set forth in the board's final order. The statute provides in part:
(1) After the time set for complying with the requirements of this chapter under RCW 36.70A.300(3)(b) has expired, or at an earlier time upon the motion of a county or city subject to a determination of invalidity under RCW 36.70A.300, the board shall set a hearing for the purpose of determining whether the state agency, county, or city is in compliance with the requirements of this chapter.
. . . .
(3) If the board after a compliance hearing finds that the state agency, county, or city is not in compliance, the board shall transmit its finding to the governor. The board may recommend to the governor that the sanctions authorized by this chapter be imposed....
(4) In a compliance hearing upon petition of a party, the board shall also reconsider its final order and decide, if no determination of invalidity has been made, whether one now should be made under RCW 36.70A.302.
RCW 36.70A.330.
It was under this section of the Act that Friends moved for a finding of noncompliance and a declaration that sections of Skagit County's 1979 code were invalid.[13]
Friends argues that the Act should be interpreted to expressly allow a growth management hearings board to invalidate any development regulation, no matter when it was enacted. The Act defines "development regulations" as
the controls placed on development or land use activities by a county or city, including, but not limited to, zoning ordinances, critical areas ordinances, shoreline master programs, official controls, planned unit development ordinances, subdivision ordinances, and binding site plan ordinances together with any amendments thereto....
RCW 36.70A.030(7). The Act then refers to development regulations numerous times throughout RCW 36.70A. See, e.g., RCW 36.70A.020 (the Act's planning goals are adopted for the purpose of guiding the development and adoption of comprehensive plans and development regulations); RCW 36.70A.040 (development regulations must be consistent with and implement the comprehensive plan); RCW 36.70A.106 (county must notify department of community trade and economic development of its intent to adopt comprehensive plan or development regulations under the Act); RCW 36.70A.110(5) (interim development regulations must be adopted to comply with the mandates of the Act). See also WAC 365-195-800 (Implementing development regulations under the Act are specific controls placed on development or land use activities by a county or city; such development regulations must be consistent with comprehensive plans developed pursuant to the Act and must implement those comprehensive plans. Interim development regulations include the designation of interim urban growth areas which must be in the form of development regulations and which generally precede the adoption of comprehensive plans.).
Other than its mention in the definition section of the Growth Management Act, the only references to development regulations in *973 chapter 36.70A RCW are to interim or implementing development regulations. While we agree that the language of the definition section of the Act appears to broadly define "development regulations," that broad definition is circumscribed by the other sections of the Act. Furthermore, the Task Force's 1994 recommendations on invalidity refer to implementing and interim regulations, not pre-Act regulations.
Our goal in interpreting a statute is to ascertain and carry out the intent of the Legislature. State v. Alvarez, 128 Wash.2d 1, 11, 904 P.2d 754 (1995); Oostra v. Holstine, 86 Wash.App. 536, 540, 937 P.2d 195 (1997), review denied, 133 Wash.2d 1034, 950 P.2d 478 (1998). We look to the language of the statute, interpreting all provisions in relation to each other, to determine that intent. Tommy P. v. Board of County Comm'rs, 97 Wash.2d 385, 391, 645 P.2d 697 (1982); Oostra, 86 Wash.App. at 540, 937 P.2d 195.
On its own, the definition of "development regulations" does not provide authority for the boards to invalidate pre-Act zoning ordinances. When read in conjunction with the jurisdictional and enforcement sections, we conclude the authority to consider and invalidate pre-Act zoning regulations is not expressly granted to the growth management hearings boards, unless the regulation at issue falls within the scope of RCW 36.70A.302(4).
Although the authority is not expressly granted in the statutory language, the Board action may be valid if the authority is necessarily implied by the Growth Management Act.
Generally, administrative agencies have the implied or incidental powers that are reasonably necessary in order to carry out the powers expressly granted....
2 AM. JUR. 2D, Administrative Law § 62 (1994) (footnotes omitted). See also Tuerk v. Department of Licensing, 123 Wash.2d 120, 124-25, 864 P.2d 1382 (1994); Kaiser Aluminum, 121 Wash.2d at 780, 854 P.2d 611.
However, where implied authority to grant or impose a particular remedy is not clearly set forth in the statutory language or its broad implication, the courts of this state have been reluctant to find such authority on the part of an agency. Thus in Human Rights Comm'n, this court held that the Human Rights Commission did not have authority to award compensation for humiliation and mental suffering caused by age discrimination, even though such compensation was available in a court action under RCW 49.60, the statute creating the Commission. Human Rights Comm'n, 97 Wash.2d at 126-27, 641 P.2d 163. There we stated, "While the Commission may have somewhat broad power concerning the identification of unfair practices, it has been provided with limited power to resolve them." 97 Wash.2d at 126, 641 P.2d 163. See also Cohn v. Department of Corrections, 78 Wash.App. 63, 68, 895 P.2d 857 (1995) (Personnel Appeals Board does not have express or implied authority to award attorney fees to prevailing party in proceeding before the board).
Where the language to fashion a remedy is broadly stated and the statute at issue is to be liberally construed, we have cautiously interpreted the statutory authority of the agency to allow, in limited circumstances, orders for relief that may not be specifically set forth in the statute creating the agency and defining its powers. See, e.g., Municipality of Metro. Seattle v. Public Employment Relations Comm'n, 118 Wash.2d 621, 633-34, 826 P.2d 158 (1992) (where PERC had statutory authority to fashion "appropriate remedial orders" the statute permitted an order requiring the parties to submit to interest arbitration).
In the present case, the statute carefully limits the boards' authority, RCW 36.70A.280(1) and .290, and sets forth the circumstances under which a county's pre-Act ordinances may be invalidated. RCW 36.70A.302(4). Additionally, the statute does not contain the requirement that it be liberally construed.
Friends points to the 1997 amendments to the Growth Management Act, Laws of 1997, ch. 429, to show that the Legislature agrees with the Western Washington Growth Management Hearings Board's interpretation of the Act. In Friends' view, the fact that the Legislature did not state that the hearings boards are *974 without power to invalidate pre-Act ordinances evidences an acquiescence in the board's interpretation of the Act. The Legislature's failure to amend a statute which has been interpreted by administrative regulation may constitute "silent acquiescence" in the agency's interpretation of the statute. Newschwander v. Board of Trustees of State Teachers' Retirement Sys., 94 Wash.2d 701, 711, 620 P.2d 88 (1980); Ward v. LaMonico, 47 Wash.App. 373, 377, 735 P.2d 92 (1987); see also Manor v. Nestle Food Co., 131 Wash.2d 439, 445 n. 2, 932 P.2d 628, 945 P.2d 1119 (1997), cert. denied, 118 S.Ct. 1574, 140 L.Ed.2d 807 (1998). The rule does not apply here, where the administrative interpretation is not by regulation or rule but is, instead, included in a ruling in a contested case and where the interpretation is not consistent within the tribunals charged with hearing petitions under the statute. The three growth management hearings boards do not agree with respect to their authority over pre-Act ordinances. See, e.g., Kitsap Citizens for Rural Preservation v. Kitsap County, Washington Growth Management Hearings Bds. Dec. & Orders (Code Publ'g Co.) 583, 591-92 (July 27, 1994) (Board's jurisdiction is limited to plans and regulations adopted pursuant to Growth Management Act); City of Auburn v. Pierce Cy., Washington Growth Management Hearings Bds. Dec. & Orders (Code Publ'g Co.) 2423, 2424-25 (May 1, 1997) (same).
Amicus 1000 Friends argues that the power to invalidate any development regulation, including a pre-Act regulation, which does not comply with the Growth Management Act is necessary if the Act is to be implemented effectively. Amicus 1000 Friends argues that
without the authority of invalidity the requirements and deadlines of [the Growth Management Act] can be ignored with near impunity causing the public at large to suffer. Thus, as a matter of public policy invalidity authority serves an indispensable role in the enforcement of [the Act] and should be upheld.
1000 Friends Br. at 19.
Whether it would be beneficial, useful or reasonable for a growth management hearings board to have the power to invalidate pre-Act ordinances is not at issue, only the statutory authorization of that power. See, e.g., Washington Independent Telephone Ass'n v. Telecommunications Ratepayers Ass'n for Cost-Based & Equitable Rates, 75 Wash.App. 356, 364, 880 P.2d 50 (1994). Even if we agreed with 1000 Friends that public policy would be better served if the board were granted stronger remedial powers, we are not in a position to create those powers. Our role is to interpret the statute as enacted by the Legislature, after the Legislature's determination of what remedy best serves the public interest of this state; we will not rewrite the statute.
The statute grants the boards the authority to determine that a county which has failed to comply with the Growth Management Act and which continues to enforce its pre-existing ordinances is not in compliance with the Act. However, the boards' remedy for noncompliance in such circumstances is limited to a recommendation that economic sanctions be imposed against the county. A growth management hearings board does not have authority, under the statute, to review all of a county's pre-existing land use regulations to determine which would comply with the Act, and then to invalidate those regulations which do not comply.[14]
The Board in this case did not have authority to invalidate sections of the 1979 Skagit County zoning ordinance.
Because we hold the Board exceeded its statutory authority, we do not consider the remaining issues raised in this appeal.

*975 CONCLUSION
Neither the language of the statute, nor its legislative history, supports a conclusion that the Legislature intended the growth management hearings boards to have the power to review and invalidate pre-GMA zoning regulations, unless those regulations fall within the scope of RCW 36.70A.302(4). Rather than confer broad powers to enforce the Growth Management Act and to remedy its violations, the Legislature was cautious in its grant of authority to the hearings boards. Thus, the jurisdiction of the boards is limited, RCW 36.70A.280, RCW 36.70A.290(2), and its remedial powers limited. See, e.g., RCW 36.70A.330(3) (boards may not impose sanctions but may only recommend they be imposed).
The Board's declaration of invalidity is vacated.
DOLLIVER, SMITH, JOHNSON, MADSEN, ALEXANDER and SANDERS, JJ., concur.
TALMADGE, Justice (dissenting).
Skagit County (the County) willfully violated the mandate of Washington's Growth Management Act (GMA) by allowing urban-density growth outside its Urban Growth Areas (UGAs). The Western Washington Growth Management Hearings Board (Board) invalidated those parts of the County's zoning ordinance that allowed the unlawful urban sprawl, but we now overturn the Board's action because the Board lacked the authority to invalidate such an ordinance. Our decision means that Skagit County may defy the mandate of GMA, thwarting the will of the Legislature.
First, it is not clear the County's zoning ordinance at issue pre-dated the GMA. Second, the power to invalidate noncomplying pre-GMA zoning regulations is present in GMA and would be a necessary aspect of the Board's enforcement power under GMA if it were not. Moreover, the Legislature has acquiesced in such authority over the years. Because I do not believe the majority's interpretation of the Board's authority is faithful to the GMA, I respectfully dissent.
A. The Growth Management Act
In RCW 36.70A.020, the Legislature established 13 growth management goals to guide the development of comprehensive plans to be adopted by municipalities to meet the general mandate of the GMA. The 13 goals included an effort to confine urban growth to designated UGAs in order to reduce undesirable urban sprawl into rural areas.
To enforce the GMA, the Legislature in 1991 created three Growth Management Hearing Boards, one for Eastern Washington, one for Western Washington and one for the Central Puget Sound Basin. RCW 36.70A.250; Laws of 1991, 1st Sp. Sess., ch. 32, § 5. The Boards initially were given authority to hear and determine petitions alleging comprehensive plans were not in compliance with the GMA. Laws of 1991, 1st Sp. Sess., ch. 32, § 9(1). If, after a hearing, the Board determined a planning jurisdiction was not in compliance with the requirements of the GMA, it could recommend the Governor impose economic sanctions. Id. at § 14. In 1995, the Legislature gave the Boards additional authority to invalidate municipal plans or regulations that substantially interfere with fulfillment of the GMA's goals. Former RCW 36.70A.300; Laws of 1995, ch. 347, § 110. The Board's authority to invalidate the County's ordinances is the central issue of this case.
B. The GMA in Skagit County
The County's record of GMA compliance is less than exemplary. The County adopted its zoning regulations in 1979 as part of the Skagit County Code. The GMA became effective on July 1, 1990. As a county with more than 50,000 people, Skagit County was required to plan under the GMA. Laws of 1990, 1st Ex.Sess., ch. 17, § 4(1). The GMA initially required counties to adopt a comprehensive land use plan consistent with its requirements by July 1, 1993. Id. at § 4(2), (3). The first two of the Legislature's stated goals for the GMA were the encouragement of development in urban areas and the reduction of sprawl, by which it meant "the inappropriate conversion of undeveloped land into sprawling, low-density development." Id. at § 2(1), (2).
*976 To achieve these goals, the GMA required the County to designate urban growth areas, as that term is defined in the Act. Id. at § 11(1). The idea was to confine urban growth to these areas and not allow it to overrun surrounding undeveloped areas:
For two reasons the GMA rejects the sprawling development patterns that have proliferated since World War II. First, by minimizing the area devoted to development, land with environmentally critical qualities and commercially valuable natural resources can be protected and preserved. Second, by concentrating development in contiguous areas, public facilities may be provided more efficiently and with less environmental harm.
Richard L. Settle & Charles G. Gavigan, The Growth Management Revolution in Washington: Past, Present, and Future, 16 U. PUGET SOUND L. REV. 867, 872-73 (1993) (footnotes omitted) (concentration of growth to urban areas the "central and most controversial policy of the GMA").
When it appeared jurisdictions were having difficulty completing their comprehensive planning process by July 1, 1993, the Legislature extended the deadline by one year to July 1, 1994. Laws of 1993, 1st Sp. Sess., ch. 6, § 1(3). In order to preserve undeveloped land from urban sprawl during the extension period, however, the Legislature gave jurisdictions only until October 1, 1993 to designate interim UGAs. Id. at § 2(4).
The County responded to this new statutory mandate expeditiously. On June 29, 1993, ahead of the deadline, it enacted an ordinance to check "undesirable sprawling, low-density growth patterns." Ordinance 14925 at 3.[1] The ordinance amended four paragraphs of the Skagit County Code dealing with Multi-Family Residential, Residential, Residential Reserve, and Rural Intermediate housing and required 5 acre minimum lot sizes per dwelling unit, a decidedly rural density. The old ordinances allowed for dense, urban development. The duration of Ordinance 14925 was set at slightly under five months (148 days), or until such time as the land use designation element of the comprehensive plan were to be adopted, whichever came first.
The record is silent about what happened when the 148 days had passed. Apparently, however, the County took some action to perpetuate Ordinance 14925 because the next reference to the ordinance in the record is another Skagit County ordinance, Ordinance 15372, dated May 24, 1994, which recites that Ordinance 14925 was to expire on May 25, 1994. The County declared in this new ordinance that its findings supporting Ordinance 14925 were still valid, and readopted them. Ordinance 15372 perpetuated Ordinance 14925 until such time "as the comprehensive land use element is adopted and implemented." Thus, the County's ordinance containing the new anti-sprawl provisions (amending the old code to limit development to one dwelling unit per 5 acres in rural areas) purportedly became of indefinite duration.
By now nearly four years had passed since the GMA first went into effect on July 1, 1990, but the County still had not adopted a comprehensive plan under the GMA. Six more months passed, and Ordinance 14925 expired by operation of law. Although Ordinance 15372 purported to keep 14925 in effect until adoption of the comprehensive plan, RCW 36.70A.390 provides a six-month sunset provision for interim zoning ordinances. A county may renew an interim ordinance indefinitely, but only after holding a public hearing for each renewal. The County took no action to renew its interim zoning ordinance, and it expired on November 23, 1994, six months after the enactment of Ordinance 15372. In fact, not only did the County take no action to renew its interim zoning controls, it passed an ordinance on December 26, 1994, specifically rescinding both Ordinance 14925 and Ordinance 15372. Ordinance 16007.
Expiration of those two ordinances operated to reenact the original wording of the zoning regulations Ordinance 14925 had amended. The County thus turned back the clock to 1979 on regulation of residential *977 development in its rural areas. Gone was the one-dwelling-unit-per-5-acre limitation.[2] Residential development could now proceed outside the UGAs in Skagit County just as if GMA, which by this time had been on the books for four and a half years, did not exist.
By reenacting its previous ordinances and allowing urban residential densities in areas of Skagit County outside the urban growth boundaries, the County was in open defiance of the dictates of the GMA. We have previously indicated our disapproval of public bodies that flout the law. In R/L Assocs., Inc. v. City of Seattle, 113 Wash.2d 402, 411, 780 P.2d 838 (1989) (quoted with approval in Sintra, Inc. v. City of Seattle, 119 Wash.2d 1, 10, 829 P.2d 765 (1992)), we said in a situation where the City had disregarded a trial court injunction, "The courts need not tolerate this intentional violation of a valid judgment that prohibited the City from enforcing those provisions." In another case, we denounced a city's "reprehensible misuse of government power" when city officials refused to allow a landowner to build apartments even though the landowner had complied with all the necessary requirements. Alger v. City of Mukilteo, 107 Wash.2d 541, 548, 730 P.2d 1333 (1987).
A citizen group and two individuals moved the Board to declare the reenacted regulations invalid (as well as the entire Skagit County zoning code) because the regulations did not preclude urban growth outside the interim UGAs. The Board adopted an order of noncompliance only after the hearing on October 31, 1995, where the County argued the Board had no authority to invalidate pre-GMA regulations. The County response to the October 31, 1995 order was partial compliance, but it allowed its ordinance regarding limitations on rural development to expire, opening up thousands of acres of rural Skagit County to development in violation of GMA. The County indicated it would further comply with the requirements of GMA "in due time." The Board adopted its subsequent order of invalidity in response to the County's failure to address the order of noncompliance.[3]
C. The Board's Statutory Invalidation Authority
In 1995, the Legislature amended the GMA to add an invalidation provision to the Board's enforcement authority:
(2) A finding of noncompliance and an order of remand shall not affect the validity of comprehensive plans and development regulations during the period of remand, unless the board's final order also:
(a) Includes a determination, supported by findings of fact and conclusions of law, that the continued validity of the plan or regulation would substantially interfere with the fulfillment of the goals of this chapter; and
(b) Specifies the particular part or parts of the plan or regulation that are determined to be invalid, and the reasons for their invalidity.
Laws of 1995, ch. 347, § 110(2).[4] With this invalidation authority in hand, the Board rejected the County's argument that the Board could not invalidate pre-GMA ordinances. It found those ordinances permitted 44,000 rural acres in Skagit County to be developed *978 with nonrural densities. It found those ordinances would allow "uncoordinated and unplanned development ... outside Interim Urban Growth Areas" and discourage "development in municipal urban growth areas where adequate public facilities and services exist or can be provided in an efficient manner." Clerk's is Papers at 31. As a result of those findings and others, the Board concluded as a matter of law the reenacted sections of the Skagit County code "substantially interfere with the fulfillment of several sections of the GMA," and invalidated them pursuant to the authority granted in RCW 36.70A.300(2). Clerk's Papers at 32.[5]
The County and the majority state the single dispositive issue in this case is whether the Board exceeded its statutory authority when it invalidated portions of the County's zoning code first enacted in 1979. The majority resolves the dispositive issue by observing a "pre-GMA" ordinance could never be challenged under RCW 36.70A.290(2), because the 60-day limitation for challenging development regulations promulgated under the GMA could never be met in the case of an ordinance that preexisted enactment of the GMA. Majority op. at 970. Both the County and the majority assume without discussion the ordinances at issue here are "pre-GMA" ordinances. They also assume without discussion that "pre-GMA" ordinances are not subject to invalidation by the Board. Neither of these assumptions holds.
1. Pre-GMA Development Regulations
The Legislature employed a generic term"development regulations" in RCW 36.70A.030(7) in defining the authority of the Board with respect to zoning ordinances adopted to implement comprehensive plans satisfying GMA requirements. RCW 36.70A.030(7) defines "development regulations" as follows:
(7) "Development regulations" or "regulation" means the controls placed on development or land use activities by a county or city, including, but not limited to, zoning ordinances, critical areas ordinances, shoreline master programs, official controls, planned unit development ordinances, subdivision ordinances, and binding site plan ordinances together with any amendments thereto. A development regulation does not include a decision to approve a project permit application, as defined in RCW 36.70B.020, even though the decision may be expressed in a resolution or ordinance of the legislative body of the county or city.
Plainly, the Legislature did not narrowly confine development regulations to those adopted only after enactment of the GMA, but rather defined development regulations without temporal limitation. There is no language in the statute separating "pre-GMA" regulations from "post-GMA" regulations. The majority creates an artificial dichotomy by assuming a "pre-GMA" regulation can never be subject to challenge because the time period for challenging "development regulations," as defined by the GMA, is limited to 60 days after their enactment. The majority's rule does not allow for a circumstance like the present case, where a jurisdiction, either by default or positive action, enacts a development regulation under the rubric of the GMA that happens to mirror a preexisting regulation. The Legislature, however, apparently foresaw and reacted to just such a possibility.
In the 1995 amendments to the GMA, the Legislature added the following provision:
If the ordinance that adopts a plan or development regulation under this chapter includes a savings clause intended to revive prior policies or regulations in the event the new plan or regulations are determined to be invalid, the board shall determine under subsection (2) of this section whether the prior policies or regulations are valid during the period of remand.
Laws of 1995, ch. 347, § 110(4) (codified at RCW 36.70A.302(4) (1997)). The Legislature here has spoken unequivocally that there is nothing special about "pre-GMA" regulationsthat such regulations have no unique *979 protection from Board invalidation if they substantially interfere with the goals of the GMA. The Legislature enacted RCW 36.70A.302 in 1997, a year of great ferment in growth management legislation, but kept the wording of subsection (4) intact. Laws of 1997, ch. 429, § 16(4).[6]
In characterizing the revived zoning code as "pre-GMA," the majority overlooks that these regulations were in fact the County's response to the GMA mandate to control development outside the UGAs. The County at first amended its zoning code to require rural density (1 dwelling unit/5 acres) for residential development in the rural areas of the county. These new amendments were in effect, and replaced certain provisions of the 1979 zoning code, from June 29, 1993, the date the County enacted Ordinance 14925, until November 23, 1994, the day the County permitted the ordinance to lapse by operation of law.
Plainly, while there are procedural differences, there are no substantive differences between allowing superseded provisions of a code to spring back into existence by lapse of an amending ordinance, or simply drafting those superseded provisions anew and enacting them. While it is the former that occurred on November 24, 1994, the day after Ordinance 14925 lapsed, the substantive effect is just as if these were newly enacted provisions. Thus, to call them "pre-GMA" and thereby insulate them from invalidation ignores the actual procedural course of how they arose in late 1995. These were new ordinances that came into existence in 1995, subsequent to and in response to the enactment of the GMA.
2. Necessary Authority of Boards
The authority of Boards to address actions such as those of the County here is essential to the enforcement of GMA principles. The cardinal rule of statutory construction requires this Court to give effect to the intent of the Legislature. Timberline Air Service, Inc. v. Bell Helicopter-Textron, Inc., 125 Wash.2d 305, 312, 884 P.2d 920 (1994). Here, the County, by reenacting portions of its 1979 code, openly defied the GMA mandate to establish interim development regulations that would prevent urban sprawl into rural areas. The Legislature gave the Board authority to invalidate such development regulations that "substantially interfere with the fulfillment of the goals" of the GMA. That is what the Board did.
Where zoning regulations are adopted or used to frustrate GMA goals, as the County did in this case, the Board has authority to take administrative steps to enforce compliance with GMA. For the majority to rule otherwise is to condone defiance of state law. A county that simply did not like the GMA could, the day after this opinion is filed, repeal all ordinances enacted in compliance with the Act and reenact its former comprehensive plans and development regulations. These reenacted regulations, according to the majority, would be "pre-GMA" regulations, and Boards would therefore be deprived of the authority the Legislature conferred to invalidate them to enforce the GMA. An interpretation that leads to a rule of law so contrary to the central purpose of a statute cannot be right.
3. Legislative Acquiescence
A final rationale for the Board's authority to address pre-GMA development regulations is legislative acquiescence. There is strong evidence the Legislature acquiesced in the Board's interpretation of its statutory enforcement power. The Legislature created a Land Use Study Commission to review all aspects of GMA. The question of this Board's interpretation of GMA was specifically raised to the Commission, but the Commission did not recommend an amendment be offered to GMA. Although aware of the Board's order in this case and the Commissioners' decision not to address this issue, the Legislature in its 1996 and 1997 sessions did not change the law. Legislative acquiescence *980 in the interpretation of an act by the administrative body entrusted with its enforcement is strong evidence that the Board's interpretation of GMA is consistent with legislative intent. Manor v. Nestle Food Co., 131 Wash.2d 439, 446 n. 2, 932 P.2d 628 (1997).
D. Constitutional Issues
The County and Skagit Surveyors raise a bevy of constitutional issues. Because of the majority's disposition, it did not reach any of them. Because my resolution is to the contrary, it is necessary to address the constitutional issues.
1. Vesting
Both the County and Skagit Surveyors list loss of vesting rights as the chief infirmity to the constitutionality of the GMA's invalidation provision. The County claims invalidation of a county's land use regulations denies property owners the "constitutional right to know what rules ... will govern their land development." Corrected Br. of Skagit County at 17. Skagit Surveyors asserts "landowners are entitled to a date certain on which they can determine the regulations controlling their application." Br. of Skagit Surveyors at 17.
Both cite RCW 36.70A.300(3)(b) as the offending statute. The subsection they cite is to the 1995 version of the GMA. Neither the County nor Skagit Surveyors has acknowledged the Legislature amended the subsection in 1997. The successor statutes, RCW 36.70A.302(2) and (3)(a), adequately resolve the vesting concerns the parties have expressed over the 1995 version of the statute. The 1997 amendments have mooted the vesting arguments.[7]
2. Interference with the County's Police Power
The County argues the Board violated WASH CONST. art. XI, § 11 by issuing the order invalidating some County ordinances. The argument is wholly without merit, and borders on being frivolous.
Article XI, § 11, which the County fails to quote in its brief, says simply: "Any county, city, town or township may make and enforce within its limits all such local police, sanitary and other regulations as are not in conflict with general laws." In its considered judgment, and in furtherance of its legislatively delegated authority, the Board found and concluded the County's interim zoning ordinances were "in conflict with general laws," i.e., the GMA itself. As the Legislature empowered it to do, the Board therefore invalidated those ordinances. This was not in violation of art. XI, § 11 or any other provision of the state or federal constitutions.
The state constitution consigns legislative authority in Washington to the Legislature. WASH. CONST. art. II, § 1. Like most states, Washington delegates its zoning authority to local jurisdictions, but exceptions exist, such as in our sister state, Oregon. 1 ROBERT M. ANDERSON, AMERICAN LAW OF ZONING 3d 30-36 (1986). The Planning Enabling Act, RCW 36.70, is the statutory delegation of zoning authority. Thus, local zoning control in Washington is a matter of legislative grace, not constitutional fiat. Because the Legislature may enact or repeal any zoning ordinances whatsoever for the County should it choose to do so, it may certainly invalidate, through an administrative agency, any Skagit *981 County ordinances in conflict with the general laws of Washington.
3. Taking
Skagit Surveyors and the County argue the finding of invalidity is a total taking of property without just compensation because it denies owners of undeveloped land within the invalidated zones all economic use of their property. Br. of Skagit County at 56; Br. of Skagit Surveyors at 26. They assert the Board should pay an unspecified amount of compensation for this total taking. They do not assert any of their property was taken; thus, they have no standing to assert a claim for just compensation. Crane Towing, Inc. v. Gorton, 89 Wash.2d 161, 172-73, 570 P.2d 428, 97 A.L.R.3d 482 (1977). Absent standing, we are without subject matter jurisdiction to entertain the taking claim.
4. Arbitrary and Capricious
Skagit Surveyors and the County assert the Finding of Invalidity leaves the County without the necessary zoning ordinances in place to control development, and that such a consequence is so monstrous and absurd as to constitute an arbitrary and capricious decision. Skagit Surveyors and the County overlook the obvious: sound public policy required the County to enact conforming development regulations as soon as possible after the Finding of Invalidity, rather than leaving Skagit County landowners in the lurch as to how their land might be developed. The Board noted the County could request a hearing to lift the invalidity declaration "at any time." Clerk's Papers at 27. Like the jailed contemnor whose purging of the contempt is the key to the jailhouse door, the County's prompt enactment of conforming development regulations would have relieved the situation it now complains of. Swift compliance was evidently not in the County's contemplation, however. It was not until July 14, 1997, 523 days after entry of the February 7, 1996 Finding of Invalidity, that the County finally met all the Board's requirements, and the Board entered its Order Rescinding Invalidity.
In summary, the constitutional objections Skagit Surveyors and the County raise are without merit.

CONCLUSION
The majority here interprets the powers of Growth Management Hearings Boards under GMA in a fashion contrary to a common sense enforcement authority for the Board and the statute's legislative history. More troublesome yet is the fact that the majority has rewarded the County for its deliberate recalcitrance and defiance of state law. The County opened up 44,000 acres of rural lands in Skagit County to development contrary to the GMA. How can we square our commitment to the rule of law with the majority's decision condoning the behavior of a lawbreaker?
The County asserts it seeks only focused and limited relief. All it wants us to do is declare that the County may promulgate development regulations that are entirely out of compliance with the goals of the GMA, without fear of invalidation by the Board, simply because those regulations existed before the GMA. While such relief might indeed be focused and limited, it makes the GMA a nullity in Skagit County and in every other GMA planning jurisdiction in the State. Quite literally, the County's response to the GMA mandate to limit urban sprawl was to put in place an ordinance that allowed 26 dwelling units per 5 acres on land outside the urban growth boundaries. The County justifies this defiance of the GMA by claiming the Board had no authority to invalidate the ordinance. The majority's support for the County's argument is based on an erroneous, hypertechnical reading of the GMA.
I would give effect to the intent of the GMA and not allow local jurisdictions to evade its mandates by giving immunity to ordinances in effect subsequent to the enactment of the GMA, simply because those ordinances first came into being before the GMA. The GMA does not define or give *982 special immunity to "pre-GMA" ordinances. Nor should this Court.[8]
DURHAM, C.J., concurs.
NOTES
[1] Laws of 1991, ch. 322, § 23; Laws of 1991, 1st Sp. Sess., ch. 32; Laws of 1992, ch. 207, § 6; Laws of 1992, ch. 227; Laws of 1993, ch. 478, §§ 11, 23; Laws of 1993, 1st Sp. Sess., ch. 6; Laws of 1994, chs. 249, 257, 258, § 2, 273, § 17, 307; Laws of 1995, chs. 49, § 3, 190, 347, 377, 378, 382, 399, § 43, 400, 402; Laws of 1996, chs. 167, 239, 325; Laws of 1997, chs. 382, 429.
[2] "Urban growth" is defined in RCW 36.70A.030(17) as growth which "makes intensive use of land for the location of buildings, structures, and impermeable surfaces to such a degree as to be incompatible with the primary use of land for the production of food, other agricultural products, or fiber, or the extraction of mineral resources, rural uses, rural development, and natural resource lands designated pursuant to RCW 36.70A.170. A pattern of more intensive rural development ... is not urban growth. When allowed to spread over wide areas, urban growth typically requires urban governmental services."
[3] Members of the growth management hearings boards are appointed by the Governor for six-year terms. Each growth management hearings board consists of three members, each of whom must be qualified by experience or training in matters pertaining to land use planning. Not more than two members may be members of the same political party. Each must reside within the jurisdictional boundaries of the applicable board, but no more than two members may reside in the same county. One of the board members must be an attorney and one must have been a city or county elected official. RCW 36.70A.260.
[4] Former RCW 36.70A.300 was amended during the 1997 legislative session. Laws of 1997, ch. 429, §§ 14, 16. The amendment changes the section number of the invalidation provisions. See RCW 36.70A.302. The 1997 amendment does not significantly impact the parties in this action or the underlying issues on appeal.
[5] The interim control ordinance apparently had expired by the time the Commissioners voted to rescind it. The Commissioners' action thus was without legal effect.
[6] Attorneys for both the City of Anacortes and the City of Mt. Vernon filed affidavits in the Court of Appeals stating that the cities do not wish to participate in this appeal.
[7] This section of the statute was amended by the Legislature after we heard oral argument in this case. Laws of 1998, ch. 186. The amendment added the following subsection:

"(6) For purposes of this section, service upon the attorney of record of any agency or party of record constitutes service upon the agency or party of record."
[8] Beginning June 11, 1998, RCW 34.05.542, as recently amended, authorizes service upon an attorney of record for any agency or party in order to invoke the superior court's appellate jurisdiction.
[9] None of the parties discusses the applicability of Union Bay to appeals, like this one, that are heard initially by an appellate court under RCW 34.05.518.
[10] The present action was decided under former RCW 36.70A.300(2), which is substantially the same as the amended, renumbered section quoted here.
[11] The Task Force was created by the Governor in 1993 to make recommendations to the Governor with respect to growth management legislation. Exec. Order No. 93-06.
[12] The Task Force Report uses the term "invalid" when referring to plans and regulations that are not in compliance with the Growth Management Act.
[13] RCW 36.70A.330 was amended in 1997, Laws of 1997, ch. 429. The current version of the statute, which is quoted above, is substantially the same as the former statute.
[14] In 1997 the Legislature amended the Growth Management Act. The Act now permits a petition to be filed either with a growth management hearings board or in the superior court. Laws of 1997, ch. 429, § 13. The superior court, like the boards, has authority to declare a county regulation invalid if it finds the regulation would substantially interfere with the fulfillment of the goals of the Act. Laws of 1997, ch. 429, § 13(4). The superior courts also have the power to hold a county, or its board of commissioners, in contempt, if the county fails or refuses to comply with an order of the court. Laws of 1997, ch. 429, § 13(5).
[1] The ordinance appears in the record as an exhibit to a pleading without consecutive numbering like the other clerk's papers.
[2] Under the revived code for a multifamily residential district, for instance, the minimum lot size allowable for a single family dwelling on a public sewer is 8,400 square feet. An acre is 43,560 square feet. Five acres are 217,800 square feet. Thus, the revived zoning code would permit approximately 26 dwelling units (217,800 divided by 8,400) on 5 acres, compared to the one dwelling unit the interim development regulation permitted.
[3] The County does not allege that the Board lacked authority from the Legislature to enforce GMA. The County simply defied the order of a legitimately constituted state agency.
[4] After the 1997 amendments to the GMA, this section now reads:

(1) A board may determine that part or all of a comprehensive plan or development regulations are invalid if the board:
(a) Makes a finding of noncompliance and issues an order of remand under RCW 36.70A.300;
(b) Includes in the final order a determination, supported by findings of fact and conclusions of law, that the continued validity of part or parts of the plan or regulation would substantially interfere with the fulfillment of the goals of this chapter[.]
RCW 36.70A.302(1).
[5] The Board also invalidated six other sections of the County's zoning code that were not subject to the amendments enacted by Ordinance 14925.
[6] Chapter 429 of the Laws of 1997, entitled Growth ManagementModifications, contains 52 sections comprising additions and amendments to existing legislation in both the Growth Management Act and related chapters. The Governor vetoed 12 of the 52 sections of the measure.
[7] RCW 36.70A.302(2) and (3)(a) read, respectively:

(2) A determination of invalidity is prospective in effect and does not extinguish rights that vested under state or local law before receipt of the board's order by the city or county. The determination of invalidity does not apply to a completed development permit application for a project that vested under state or local law before receipt of the board's order by the county or city or to related construction permits for that project.
(3)(a) Except as otherwise provided in subsection (2) of this section and (b) of this subsection, a development permit application not vested under state or local law before receipt of the board's order by the county or city vests to the local ordinance or resolution that is determined by the board not to substantially interfere with the fulfillment of the goals of this chapter.
[8] The majority opinion holds that failure to comply with service requirements results in a failure of subject matter jurisdiction. Majority op. at 968-69. I believe this statement betrays a flawed understanding, and reaffirm my adherence to Chief Justice Durham's scholarly concurrence in Okanogan Wilderness League, Inc. v. Town of Twisp, 133 Wash.2d 769, 947 P.2d 732 (1997).